IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DEANGELO HORN,
          Petitioner,

vs.                                    Case No.: 4:15cv101/RH/EMT

SECRETARY FLORIDA DEPARTMENT
OF CORRECTIONS,
          Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1). Respondent filed an answer and relevant portions of the state court record (ECF No. 15). The Court directed Petitioner to file a reply (*see* ECF No. 17), but he has not done so.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of

the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 15).[1]  Petitioner was charged by a third amended information filed in the Circuit Court in and for Leon County, Florida, Case No. 2010-CF-688, with one count of sexual battery on a child under 12 years of age (Count I), one count of lewd or lascivious molestation (Count II), one count of false imprisonment (Count III), one count of tampering with a witness or informant (Count IV), and one count of misdemeanor battery (Count V) (Ex. A at 15–16).  Following a jury trial, Petitioner was found guilty as charged of Count I, guilty of the lesser offense of attempted lewd or lascivious molestation as to Count II, and not guilty of Counts III, IV, and V (Ex. A at 73–77, Exs. D, E, F).  On May 9, 2011, Petitioner was sentenced to a mandatory term of life imprisonment on Count I, with pre-sentence jail credit of 419 days, and a consecutive term of fifteen (15) years in prison followed by fifteen (15) years of probation on Count II (Ex. A at 83–93, 109–25).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 15).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-2695 (Ex. A at 95, Ex. G).  On September 19, 2012, the First DCA affirmed the conviction and sentence as to Count I, and reversed and remanded for a new trial as to Count II (Ex. I).  Horn v. State, 120 So. 3d 1 (Fla. 1st DCA 2012).  On remand, the trial court vacated Petitioner's conviction and sentence as to Count II, pursuant to the parties' stipulated motion, in an order rendered February 4, 2013 (Ex. J).

On April 12, 2013, Petitioner filed a motion for post-conviction DNA testing, pursuant to Rule 3.853 of the Florida Rules of Criminal Procedure (Ex. K at 1–11). The trial court summarily denied the motion in an order rendered August 15, 2013 (*id.* at 103–07).  Petitioner appealed the decision to the First DCA, Case No. 1D13-4551 (Ex. L).  The First DCA affirmed the decision per curiam without written opinion on January 23, 2014, with the mandate issuing February 18, 2014 (*id.*).  Horn v. State, 130 So. 3d 1280 (Fla. 1st DCA 2014) (Table).

On June 5, 2013, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, raising nine claims (Ex. M at 1–51).  Petitioner filed a supplement on July 17, 2013, adding two claims  (*id.* at 52–65).  The state circuit court summarily denied Petitioner's claims in an order

rendered November 22, 2013 (*id.* at 92–104).  Petitioner appealed the decision to the First DCA, Case No. 1D13-6190 (*id.* at 418–22).  The First DCA affirmed the decision per curiam without written opinion on June 11, 2014, with the mandate issuing August 8, 2014 (Exs. P, S).  Horn v. State, 143 So. 3d 926 (Fla. 1st DCA 2014) (Table).

On August 15, 2014, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D14-3744, alleging ineffective assistance of appellate counsel (Ex. T at 1–12).  The First DCA denied the petition on the merits on September 9, 2014 (Ex. U).  Horn v. State, 146 So. 3d 1236 (Fla. 1st DCA 2014) (Mem).

On August 11, 2014, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. V at 1–2).  The state circuit summarily denied the motion in an order rendered August 20, 2014 (*id.* at 5–7).  Petitioner appealed the decision to the First DCA, Case No. 1D14-4163 (*id.* at 8).  The First DCA affirmed the decision per curiam without written opinion on November 10, 2014, with the mandate issuing December 8, 2014 (Ex. W).  Horn v. State, 151 So. 3d 1236 (Fla. 1st DCA 2014) (Table).

Petitioner filed the instant federal habeas action on February 16, 2015 (ECF No. 1).

## II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

there has been an adjudication on the merits in a formal State court proceeding, the

federal court should first ascertain the "clearly established Federal law," namely, "the

governing legal principle or principles set forth by the Supreme Court at the time the

state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.

Ct. 1166, 155 L. Ed. 2d 144 (2003). "Clearly established Federal law, includes only

the holdings, as opposed to the dicta, of the Supreme Court's decisions." Woods v.

Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation

omitted).

Next, the court must determine whether the State court adjudication is contrary

to the clearly established Supreme Court case law, either because "'the state court

applies a rule that contradicts the governing law set forth in [the Supreme Court's]

cases' or because 'the state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives

at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73

(quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that

"[a]voiding these pitfalls does not require citation to our cases—indeed, it does not

even require awareness of our cases, so long as neither the reasoning nor the result of

the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct.

362, 154 L. Ed. 2d 263 (2002) (quoting <u>Williams</u>, 529 U.S. at 405–06).  If the State

court decision is found in either respect to be contrary, the district court must

independently consider the merits of the petitioner's claim.  However, where there is

no Supreme Court precedent on point, the state court's conclusion cannot be contrary

to clearly established federal law.  *See* <u>Woods</u>, 135 S. Ct. at 1377 (holding, as to claim

that counsel was per se ineffective in being absent from the courtroom for ten minutes

during testimony concerning other defendants:  "Because none of our cases confront

the specific question presented by this case, the state court's decision could not be

contrary to any holding from this Court." (internal quotation marks and citation

omitted)).

    If on the other hand, the State court applied the correct Supreme Court

precedent and the facts of the Supreme Court cases and the petitioner's case are not

materially indistinguishable, the court must go to the third step and determine whether

the State court "unreasonably applied" the governing legal principles set forth in the

Supreme Court's cases.  The standard for an unreasonable application inquiry is

"whether the state court's application of clearly established federal law was

objectively unreasonable."  <u>Williams</u>, 529 U.S. at 409.  Whether a State court's

decision was an unreasonable application of a legal principle must be assessed in light

of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S.
Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697
n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not
presented to state court in determining whether its decision was contrary to federal
law).  "In determining whether a state court's decision represents an unreasonable
application of clearly established federal law, a federal court conducting habeas
review 'may not issue the writ simply because that court concludes in its independent
judgment that the relevant state-court decision applied clearly established federal law
erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill
v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at
411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d
624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state
court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291
(citing Richter).  Under § 2254(d), a habeas court must determine what arguments or
theories supported or could have supported the state court's decision, and then ask
whether it is possible that fairminded jurists could disagree that those arguments or
theories are inconsistent with the holding in a prior decision of the Supreme Court.
*See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court

may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C.

§ 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless

the petitioner shows that he is in custody "in violation of the Constitution or laws and

treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

A.    Ground One:  "Petitioner was denied his right to effective assistance of
appellate counsel as guaranteed him under the 6th and 14th Amendments to the
U.S. Constitution where counsel failed to raise the well founded issue of
improper burden shifting."

Petitioner claims that appellate counsel was ineffective for failing to argue on

direct appeal that the trial court erred by overruling defense counsel's objection to the

following comments of the prosecutor during closing arguments, on the ground that

the comments impermissibly shifted the burden of proof to the defense:

> MR. MARSEY [the prosecutor]:  DNA does not lie. . . . *The evidence is
> not in dispute.  That evidence is not in dispute*.
> . . . .
>         There's been insinuation, this suggestion, this speculation, this
> possibility that Monikia Moore performed oral sex on the Defendant two
> to three weeks before.  *And then what?  The unsaid completion of that
> argument is* that she kept that semen in a bottle, in a jar, in her pocket.
> And she kept that semen for two to three weeks.  *And then for some
> unknown reason, some undisclosed reason*, the morning of March 5,
> 2010, she decides to spring her trap and planted this semen, the
> Defendant's semen on her sister's vagina.
> . . . .
> *But that morning, for some reason that is not in evidence it did not come
> from this witness stand.  There's no exhibits you can look at*.  Monikia
> Moore supposedly decided to take that man's semen and plant it on his

sister's—her sister's vagina, out of the blue. *There's no physical evidence. There's no testimonial evidence it happened.*

. . . .

There's three elements that I must prove to you beyond a reasonable doubt. The first, DeAmbernique Moore was less than 12 years of age. *It's not even in dispute.* She told you she was 11. Her mom said she was 11. I think her sister said she was 11. *There's no evidence to the contrary.* . . . Deangelo Horn was 18 years of age or older, *not in dispute.* He told you himself he's 26 today. So he would have been at least 24, maybe 25, depending on when his birthday fell in March of 2010. *Those are not in dispute.*

. . . .

Now, there's been a lot of testimony, *it's not contested*, that after this Defendant grabbed her [Monikia Moore] by the throat, pushed her up against the wall, prevented her from leaving the bathroom, all the while, threatening to kill her and her brother and her sister after that occurred. *It's not in dispute* she went to Publix.

[During the prosecutor's rebuttal:]

Is the story the Defendant is telling you reasonable? Eyewitness, testifying victim, *DNA that's not even contested*? Is what they're telling reasonable? Let's poke some holes in their conspiracy theory. *There's no eyewitness to what the Defendant would ask you to believe* that Monikia planted the semen on DeAmbernique's vagina or panties. *There's no witness. There's no physical evidence that that occurred.* You've got a two- or three-week gap. She allegedly performed oral sex on him. Two or three weeks goes by. They had been living together, living together at that hotel room. *Is there any evidence or testimony that that cup was saved, that it was lying around?* If there was a cup of semen sitting around your hotel room, do you think you would notice that over a period of two or three weeks? The Defendant said that he saw her spit it into a cup. *Where did she hide that cup over two or three weeks while they were living together? No physical evidence. No scientific evidence that that's possible.*

In the opening statement, Mr. Remland told you that it's scientifically possible for that to occur. *He did not deliver on that promise to you. There is no evidence, physical, testimonial, scientific, or otherwise, that that was planted*, just the possibility that it was planted after she had saved this and hidden that semen in the hotel room for two or three weeks.

Unsubstantiated claim, I've written down *testifying victim, eyewitness, DNA that's not contested*. . . . DNA is the best evidence. *It's not contested*. . . .

*But we're going to pop—we're going to speculate and guess of what happened in that two- to three-week interim. We're going to speculate. We're going to guess, did Monikia plant the semen on the panties? Or are we going to speculate and guess that she planted it on her sister's vagina? Well, no, there's no evidence that either of those occurred.*
. . . .
What motive does Monikia have? We've got this inference that after three weeks of her hiding this semen in the room that they shared that she just decided on March 5th to plant it on her sister. *Why? Why? There's no evidence of any dispute, argument, fight, falling out, breakup, any kind of domestic issue that would prompt some kind of heinous, atrocious conduct, no motive.*
.
*And there's no evidence that she saved the semen and tried to inject it to get pregnant.*
. . . .
He's going to flee the State out of fear that they found out that she had alcohol? Monikia was there. *Why wouldn't Monikia be in trouble*?

*There's no evidence of that. No evidence that anybody is upset with Monikia*, because she, along with Mr. Horn, were supervising these children. *No evidence that they got upset.* Stephanie Moore didn't tell you, oh, I found out—I was really mad, because he gave my daughter alcohol. No. They were upset, because that man put his penis in her

little girl.  That's why she was upset, and rightfully so.  Everybody was
fine all day long.  No, they weren't.  Yes, Monikia drove around town
with him.  That's true.  That is absolutely true.  *That's a fact, and it's
undisputed.  What's also undisputed is that she called her family
members that same day*.
. . . .
*There's no evidence, testimonial, physical, scientific, or otherwise that
this planting occurred*.

(ECF No. 1 at 3–5) (emphasis in original).  Petitioner contends that if appellate

counsel had argued that the prosecutor's comments constituted improper burden-

shifting, his conviction for sexual battery would have been reversed (*id.* at 5).

Respondent concedes that Petitioner exhausted this claim in the state courts

(ECF No. 15 at 20).  Respondent argues that the state court's adjudication of the

ineffective assistance of appellate counsel ("IAAC") claim is entitled to deference (*id.*

at 20–26).

1.    Clearly Established Federal Law

The standard for evaluating a claim of ineffective assistance of appellate

counsel is the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).

*See* Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 746 (2000)

(citation omitted).  The two components of an ineffectiveness claim under Strickland

are deficient performance and prejudice, and if an insufficient showing is made as to

one, the court need not address the other.  Strickland, 466 U.S. at 697.  The focus of

inquiry under the performance prong of Strickland is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691.

Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal. Jones v. Barnes, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). To demonstrate prejudice, Petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal. *See* Robbins, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the Strickland standard with regard to claims of ineffective assistance of appellate counsel. Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)). Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the

reasonable conclusion that the appellate court will not hear the issue on its merits. Diaz v. Sec'y Dep't of Corrs., 402 F.3d 1136, 1142 (11th Cir. 2005); Atkins v. Singletary, 965 F.2d 952, 957 (11th Cir. 1992); Francois v. Wainwright, 741 F.2d 1275, 1285–86 (11th Cir. 1984).  Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal. Nyhuis, 211 F.3d at 1344 (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)).

2.    Federal Review of State Court Decision

Petitioner raised this IAAC claim as his sole ground for relief in his state habeas petition (Ex. T).  The First DCA denied the claim on the merits without a written explanation of its ruling (Ex. U).

The record demonstrates that Petitioner's appellate counsel filed a merits brief arguing two issues:  (1) Petitioner's convictions for sexual battery (Count I) and attempted lewd or lascivious molestation (Count II) violated double jeopardy, and (2) the trial court reversibly erred in denying Petitioner's request for a jury instruction on the lesser included offense of committing an unnatural and lascivious act (Ex. G). Petitioner's counsel was successful on the second argument—the First DCA reversed Petitioner's conviction of attempted lewd or lascivious molestation (Count II) and

remanded the case for a new trial as to that Count (Ex. I).  On remand, the State

declined to re-prosecutor Petitioner on that charge.

The First DCA's rejection of Petitioner's IAAC claim could have been

supported by the theory that appellate counsel acted reasonably in omitting the

argument that the trial court erred by permitting the prosecutor's comments.  Under

Florida law, the standard for reviewing prosecutorial comments is the following:

> Wide latitude is permitted in arguing to a jury.  Logical inferences may
> be drawn, and counsel is allowed to advance all legitimate arguments.
> The control of comments is within the trial court's discretion, and an
> appellate court will not interfere unless an abuse of such discretion is
> shown.  A new trial should be granted when it is "reasonably evident that
> the remarks might have influenced the jury to reach a more severe
> verdict of guilt than it would have otherwise done."  Each case must be
> considered on its own merits, however, and within the circumstances
> surrounding the complained-of remarks.

Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) (quoting Darden v. State, 329 So. 2d

287, 289 (Fla. 1976)) (other citations omitted).  A prosecutor may argue both facts in

evidence and reasonable inferences from those facts.  *See* Tucker v. Kemp, 762 F.2d

1496, 1506 (11th Cir. 1985) (citations omitted).   But if the evidence is too

insubstantial to support a reasonable inference, the prosecutor's comment will be

deemed improper.  *Id.* at 1507.  Prosecutors must observe the distinction between the

permissible practice of arguing evidence and suggesting inferences which the jury

may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See* <u>United States v. Simon</u>, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Further, the prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence. <u>United States v. Johns</u>, 734 F.2d 657, 663 (11th Cir. 1984). A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury. *See* <u>White v. State</u>, 377 So. 2d 1149 (Fla. 1980). Additionally, prosecutorial comment upon a general lack of defense evidence is permissible. *See* <u>Smiley v. State</u>, 395 So. 2d 235 (Fla. 1st DCA 1981). Likewise, a prosecutor may reply to remarks, comments, or assertions made by defense counsel. *See* <u>United States v. Young</u>, 470 U.S. 1, 11–13, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (when prosecutor's comments are an "invited reply" in response to defense counsel's own remarks, and he "[does] no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction") (citations omitted).

Finally, "the limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." <u>Houston v.</u>

Estelle, 569 F.2d 372, 380 (5th Cir. 1978).  "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)).  Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied:  (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair.  *See*  United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991) (citations omitted); Brooks v. Kemp, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S. Ct. 3325, 92 L. Ed. 2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987); Dessaure v. State, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial).

Upon review of the evidence adduced at trial and the entirety of the arguments of the prosecutor and defense counsel during closing arguments (*see* Ex. F at 438–508), the undersigned concludes that the First DCA could have reasonably concluded that the prosecutor's remarks did not constitute burden-shifting.  The

prosecutor permissibly commented on the uncontradicted or uncontroverted nature of the evidence and pointed out that there was an absence of evidence on certain issues and a general lack of evidence supporting the defense's "planted evidence" theory. Further, the prosecutor's comments in rebuttal were an "invited reply" in response to defense counsel's comments that the evidence against Petitioner was planted.

Additionally, the First DCA could have reasonably concluded that the prosecutor's comments did not render the trial fundamentally unfair, especially in light of the trial court's clear instructions to the jury that (1) they must presume or believe that Petitioner is innocent; (2) the presumption stays with Petitioner as to each material allegation in the charging document through each stage of trial unless it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt; (3) to overcome Petitioner's presumption of innocence, the State has the burden of proving that the crime of which Petitioner was charged was committed and that Petitioner is the person who committed it; (4) the State must prove each element of each crime beyond a reasonable doubt; and (5) that Petitioner is not required to present evidence or prove anything (*see id.* at 510–14).

Petitioner failed to show that appellate counsel's winnowing out the issue of burden-shifting constituted deficient performance, or that there is a reasonable

probability the outcome of the direct appeal would have been different if counsel had

argued the issue.  Therefore, the state court's adjudication of Petitioner's claim was

not an unreasonable application of <u>Strickland</u>.  Accordingly, he is not entitled to

federal habeas relief on Ground One.

>    B.    <u>Ground Two:  "Trial counsel was ineffective for failing to object to the
>    trial court totally excluding re-cross examination of State witnesses (and/or
>    move for mistrial), violating Horn's confrontation and due process rights under
>    the 6th and 14th Amendments to the U.S. Constitution."</u>

Petitioner claims that defense counsel was ineffective for failing to object

and/or move for mistrial when the trial court refused to permit recross-examination

of the State's witnesses, even though the prosecutor elicited testimony on new matters

on redirect examination (ECF No. 1 at 5–7).  Petitioner acknowledges that defense

counsel was permitted to conduct recross-examination of one of the State's witnesses

(Julia Pallentino).  Petitioner also acknowledges that defense counsel argued that

recross was proper when the State elicited testimony on new matters on redirect.  But

Petitioner contends defense counsel was deficient for failing to object to the limitation

on recross after the State brought up new matters during redirect of three witnesses,

Robert Todd, Monikia Moore, and Jacolbi Banks.  Petitioner alleges Robert Todd, the

lead investigator in the case, testified to a new matter on redirect, when he stated that

he "had no clue" if anything was moved by residents of the motel room where the

sexual battery occured, prior to the arrival of law enforcement (ECF No. 1 at 14–17). Petitioner alleges Monikia Moore, the victim's sister, testified to a new matter on redirect, when she stated that her fear of Petitioner was the reason she was having difficulty remembering details about the sexual battery of her sister, and that in retrospect, she should have told police about the sexual battery when she first had an opportunity. Petitioner alleges Jacolbi Banks, the victim's brother, testified to a new matter on redirect, when he stated that family members were upset because of what Stephanie Moore (the victim's mother) told them, and that the victim was acting normally before her mother arrived. Petitioner contends there is a reasonable probability of a different outcome at trial if defense counsel had objected to the court's prohibition on recross-examination and moved for a mistrial.

Respondent concedes that Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (ECF No. 15 at 26–27). Respondent contends the state court's adjudication of the claim is entitled to deference (*id.* at 27–30).

1.    Clearly Established Federal Law

The two-pronged Strickland standard governs claims of ineffective assistance of counsel. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436

F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305,

1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong

is "reasonableness under prevailing professional norms."  Strickland, 466 U.S. at

688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and

courts should make every effort to "eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time."  Id. at 689.  If the record is not

complete regarding counsel's actions, "then the courts should presume 'that what the

particular defense lawyer did at trial—for example, what witnesses he presented or did

not present—were acts that some lawyer might do.'"  Jones, 436 F.3d at 1293 (citing

Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable

lawyers would not have done as defense counsel did at trial, no relief can be granted

on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the

circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir.

1994).  Counsel's performance is deficient only if it is "outside the wide range of

professional competence."  Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at

690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that

petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute

rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317).   Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high.  *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002).   The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal. *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176

L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was

unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788.

As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.
> The Strickland standard is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts must guard against the
> danger of equating unreasonableness under Strickland with
> unreasonableness under § 2254(d).  When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable.  The question
> is whether there is any reasonable argument that counsel satisfied
> Strickland's deferential standard.

Id. (citations omitted).

2.      Federal Review of State Court Decision

Petitioner raised this claim as Issue Two in his Rule 3.850 motion (Ex. M at

10–14).  The state circuit court correctly cited the Strickland standard as the applicable

legal standard (id. at 93).  The court adjudicated the claim as follows:

> Defendant alleges counsel was ineffective for failing to object
> and/or move for a mistrial when the trial court prohibited the recross
> examination of State witnesses.   Initially, Defendant refers to an
> exchange between the Court and attorneys at the completion of the
> testimony of Julia Pallentino, the CPT nurse who performed the child
> sexual abuse examination on the victim.  As shown by the record, the
> Court was not prohibiting counsel from the recross examination of the
> witness, which counsel had just performed, but rather was commenting
> in reaction to counsel repeatedly asking the witness the same question.

*Id.* [trial transcript] at 80–95. Therefore, there was no reason for counsel to object at that time.

Defendant claims that this failure to object led to the Court foreclosing recross examination by the defense later in the trial even when new matters were elicited by the State during redirect examination of additional State witnesses. Defendant then lists what he claims were new matters introduced during the redirect examination of the victim's sister and eyewitness Monikia Moore (that she had difficulty remembering because of her fear of defendant and she had tried to put the incident out of her mind, and that if she did it all over again she would immediately call the police instead of waiting), the victim's brother and eyewitness Jacolbi Banks (that family members were upset and that the victim had been acting normal at the hotel until her mother arrived, when she became emotional), and lead investigator Robert Todd (that he did not know if anything had been moved in the hotel room before law enforcement arrived).

"The decision to allow recross examination is generally subject to the discretion of the trial court," but should be allowed "when new matters are introduced during redirect examination." *Kelly v. State*, 842 So. 2d 223, 226 (Fla 1st DCA 2003). A review of the three witnesses' entire testimony shows that the listed matters were either not newly raised in redirect, as in the case of Ms. Moore and Inv. Todd, or were immaterial and therefore did not require further examination, as with Mr. Banks and Ms. Moore's statement that she would have called the police immediately. *Id.* at 108–21, 131–64, 174–97, 234–52. Defendant has not shown deficient performance on the part of counsel.

(Ex. M at 95–96). The First DCA affirmed the lower court's decision without written

opinion (Ex. P).

Under the Sixth Amendment's Confrontation Clause, defendants have the right

to cross-examine the government's witnesses. *See* <u>Delaware v. Van Arsdall</u>, 475 U.S.

673, 678, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). However, the defendant is entitled to only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). Accordingly, the state trial court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679. To establish a Confrontation Clause violation, the defendant must show that he was "prohibited from engaging in otherwise appropriate cross-examination" and "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination." *Id.* at 680.

A defendant has no constitutional right to recross-examination. *See* United States v. Ross, 33 F.3d 1507, 1518 (11th Cir. 1994). "A defendant nonetheless does have a limited right to recross-examination where a new matter is brought out on redirect examination." *See* United States v. Adams, 133 F. App'x 642, 646 (11th Cir. 2005); United States v. Baker, 10 F.3d 1374, 1404 (11th Cir. 1993) ("Allowing

recross is within the sound discretion of the trial court except where new matter is elicited on redirect examination, in which case denial of recross as to that new matter violates the Confrontation Clause."). Subject to the Sixth Amendment, the trial court has discretion to limit recross-examination. *See* <u>United States v. Beale</u>, 921 F.2d 1412, 1424 (11th Cir. 1991).

The issue of the trial court's limitation of recross-examination arose after defense counsel conducted recross-examination of Julia Pallentino, a child sexual abuse examiner for the Children's Home Society (*see* Ex. D at 93–95). Defense counsel asked six questions of the witness on recross, and the trial court sustained the prosecutor's objections to two of them, because the questions had been asked and answered (*id.*). After Ms. Pallentino was released, the trial court held a sidebar conference with counsel and stated:

> THE COURT: There is direct and there is cross and there is redirect. There is no recross. So for purposes of this trial, we're not going to be having recross. So questions that you're going to ask on cross examination should be on both sides. There is no recross.

> MR. REMLAND [defense counsel]: Okay. I noticed that he did redirect. And then I got up to recross because he brought something else up.

> THE COURT: What I'm suggesting is there is direct, redirect, and cross, not recross. So govern yourselves accordingly. Thank you.

(Ex. D at 95).

The relevant portions of Monikia Moore's testimony are the following. She testified on direct examination that she was staying in a motel room at the Collegiate Motel with Petitioner, her sister (the victim), her brother, and her step-sister's son (Ex. D at 112–13, 118). Ms. Moore testified that she awoke on March 5, 2010, to see Petitioner lying on top of her sister on the floor, with both of their pants down and Petitioner's face between her sister's exposed breasts (*id.* at 118–19, 133). Ms. Moore testified that she could not remember how far Petitioner's pants were down, and she could not remember whether or not she could see Petitioner's buttocks (*id.* at 119). Ms. Moore testified that she got out of bed and turned on the lights (*id.* at 120, 133). She initially testified that she could not recall whether Petitioner said anything at that time, but upon refreshing her recollection with her prior deposition testimony, she testified that Petitioner threatened to kill her and her siblings if she told anyone what she saw (*id.* at 133). Ms. Moore testified that she ran into the bathroom, and Petitioner followed her (*id.* at 134). She testified that Petitioner put his hand around her neck and threatened that if she told anyone, he would kill her and her siblings (*id.* at 135). Ms. Moore testified that Petitioner also took her cell phone (*id.*). She testified that she and her sister later went to the grocery store, but she did not report

the incident to anyone because her brother was still in the motel room with Petitioner, and she was terrified because of Petitioner's threats (*id.* at 138–39).  Ms. Moore testified that they had to move to another motel, the Motel 6 (*id.* at 139).  She testified that she eventually reported the incident to her cousin's sister, and law enforcement came to Motel 6 (*id.* at 139–40).

Defense counsel vigorously cross-examined Ms. Moore (Ex. D at 140–59).  He questioned her initial inability to remember Petitioner's threats:

> Q:    You don't remember the threats at first.  When you first were asked about it, you didn't remember those threats.  Right?  Just a little while ago, Mr. Marsey [the prosecutor] showed you some prior statements you made and then you remembered the threats.  Is that what you're saying?
>
> A.    Yes.
>
> Q.    But when he first asked you about threatening to kill you and all that, you didn't remember any of that, right?
>
> A.    No.  I'm not trying to remember this.

(Ex. D at 145).

Defense counsel continued:

> Q.    And you're saying that you didn't call 911 and call for help because you were afraid.  Is that what you're saying?
>
> A.    Yes.

Q.    You were afraid.

. . . .

Q.    You asked this man who had threatened to kill you, who took the phone away, you asked him can I have my cell phone back and he said, sure, here's your cell phone.  Right?

A.    No.

Q.    Is that how it happened?  Hmm?  You asked him for it and he gave it back.

A.    Yes, I got it back.

. . . .

Q.    You could have stopped anywhere along the way [to the grocery store] and asked for help, but you didn't because you said you were scared of Mr. Horn, right?

A.    Yes.

Q.    And you didn't call—did you call your mother?  Did you call your mother when you were walking to Publix and tell her that you just saw her daughter, your little sister, her little daughter on the floor having some sex there?  Did you tell your mom what you had just saw?

A.    No, no.

Q.    You didn't.  You didn't tell anybody.  Right?

A.    Not then.

Q.    Not then.  Okay.  It was probably later towards the evening that you told somebody, right?

A.    Yes.

. . . .

Q.    And you did not tell the police [at the Collegiate Motel] that . . . your sister was raped by Mr. Horn.  You never said that to the police.  You never said, help, he threatened my sister.  He threatened to kill me.  He raped my little sister.  Help, police, police.  Now he's gone.  Now we can go get him and arrest him.  You didn't tell that to the police.  Did you?

A.    No, I didn't tell them at first.

Q.    You didn't tell the police that were there anything about this whole case at that time, did you?

A.    No, because I was young and called myself in love.

Q.    You were young and in love, right?

A.    Yes.

Q.    That's why you didn't tell the police that he just raped your little sister?

A.    Yes.  I was being dumb.

Q.    And you were threatened—he threatened to kill you and you didn't tell the police he threatened to kill you.

A.    No, I didn't tell them.

Q.    You didn't tell them that either.

A.    Nope.

(Ex. D at 147–48, 151–52).

On re-direct examination, the prosecutor inquired:

Q.    Now, you testified, when Mr. Remland was asking you questions, that you're not trying to remember this.  Has this been difficult for you?

A.    At first it was.

Q.    And have you tried to put it out of your mind?

A.    Yes.

Q.    And is that why you had difficulty remembering some of the facts when I asked you questions earlier?

A.    Yes.

Q.    Why didn't you tell the police that came out to the Collegiate Inn what happened when that—when you saw them after you woke up and found the defendant on top of your sister?

A.    Well, I called myself in love with him and I was afraid.

Q.    Okay.  If you had to do it again, would you have told the police?

A.    Yes.

Q.    And was your fear for [sic] him, is that another reason why you had problems remembering when I asked you questions the first time I had a chance to ask you questions?

A.    Hmm, yes.

(Ex. D at 163–64).

The state court reasonably determined that Ms. Moore's testimony on redirect, that her fear of Petitioner was the reason she was having difficulty remembering details, was not a new matter.  The state court also reasonably determined that Ms. Moore's testimony, that in retrospect, she should have told police about the sexual battery when she first had an opportunity, was immaterial.   Further, Petitioner failed to show that further exploration of Ms. Moore's testimony would have given a reasonable juror a different impression of Ms. Moore's credibility, or otherwise benefitted the defense.  Therefore, the state court reasonably concluded that defense counsel was not ineffective for failing to argue that the trial court's limitation on recross was an abuse of discretion or violated Petitioner's constitutional rights.

Jacolbi Banks testified that when he awoke on the morning of March 5, 2010, he saw Deambernique getting off the floor and pulling on her clothes (Ex. E at 178). He testified that Monikia and Deambernique were crying (*id.*).  Jacolbi testified that Deambernique lay down on the bed where he was lying, and cried (*id.* at 179, 182).

During defense counsel's cross-examination of Jacolbi Banks, counsel elicited testimony that Monikia and the victim appeared to be "normal" when they left the motel to go to the grocery store (Ex. E at 188).  Defense counsel elicited additional

testimony that after Monikia and the victim returned to the Collegiate Motel from the

store, the family moved to Motel 6 (*id.* at 189–90).  Defense counsel continued:

> Q.     And during this time [at Motel 6], the police came?
>
> A.     Yes.
>
> Q.     And everybody was acting normal?
>
> A.     No—
>
> Q.     I mean Monika [sic] was acting—they were upset because of being kicked out.
>
> A.     No.  They was [sic] acting normal.  No one was upset really.
>
> Q.     All right, all right.  From your observations of looking at your sister, your two sisters, Monika [sic] and Amber, did they appear to be scared of anything?
>
> A.     No.
>
> Q.     Did they appear during the day of being afraid of Deangelo Horn?
>
> A.     No.
> . . . .
>
> Q.     So later on in the day, did you meet up with them again?  Did you meet up with Deangelo and Monika [sic] later on that day somewhere?
>
> A.     Uh-huh, when they came back.
>
> Q.     Where did you all get together at that point?

A.    We was [sic] in the room, at the room, the Motel 6.

Q.    About what time was that when you all got back together and you had the meeting?

A.    I don't remember.

. . . .

Q.    And who was there?

A.    Me, Deangelo, Monikia, Deambernique [the victim], and Kenshawn.

Q.    Was everything normal again?

A.    Yes.

Q.    Everything was okay?

A.    Yes.

(Ex. E at 190–92).

On redirect examination, the prosecutor asked:

Q.    When you went to the Motel 6, at some point did your family members get upset?

A.    Yes.

Q.    And wasn't there a bunch of conversation outside of the room?

A.    Yes.

. . . .

Q.    Without telling me anything that somebody told you, do you know why everybody was upset at Motel 6?

A.    Yes.

Q.    Okay.  And do you have any personal knowledge of that or is it just based on what somebody told you?

A.    It's based on what my mother told me, actually.

Q.    Okay.  At some point did your mother come to Motel 6?

A.    Yes.

Q.    And at Motel 6 did you observe Deambernique?

A.    Excuse me?

Q.    Did you see your sister Deambernique while you were at Motel 6?

A.    Yes.

Q.    And did you see her when your mom got there?

A.    Yes.

Q.    And can you describe how Deambernique was acting when your mom got there?

A.    She was crying.  She was very emotional.  Very emotional.

Q.    Okay.  So when Mr. Remland asked you if she was normal at Motel 6, is her crying and being emotional, is that normal?

A.    No.  She was normal before my mother got there.

(Ex. E at 194–96).

The import of the new testimony brought out on redirect (i.e., that family members were upset because of something that Jacolbi and the victim's mother told them, and that the victim was acting "normally" before their mother arrived), was, at best, minimal. Moreover, Petitioner failed to show that further exploration of the Jacolbi's testimony regarding family member's being upset, and the victim's behavior before and after her mother arrived, would have given a reasonable juror a different impression of Jacolbi's credibility, or otherwise benefitted the defense. Therefore, the state court's conclusion, that defense counsel was not ineffective for failing to object to the trial court's restriction of recross, was reasonable as to Jacolbi Banks.

Investigator Todd testified, in relevant part, that he responded to the Motel 6 on March 5, 2010 (Ex. E at 237). He testified that he obtained a statement from Monikia Moore, spoke with other officers at the scene, and coordinated with members of the Child Protection Team to arrange for the victim to be interviewed and examined by medical personnel for assembly of a sexual assault kit (*id.*). Investigator Todd testified when he learned that the sexual battery reportedly occurred at the Collegiate Inn, he asked another investigator to go there (*id.* at 238). Todd testified that he did not participate in the investigation at the Collegiate Inn (*id.*). He testified that other officers collected clothing, linens, and a carpet sample from the Collegiate Inn (*id.* at

244).  He testified that he did not send any of those items to the Florida Department of Law Enforcement ("FDLE") for DNA analysis, because law enforcement already had "the most important piece of physical evidence in the case," which was Petitioner's DNA evidence on items collected by medical personnel in the sexual assault kit (*id.* at 246–47).

Defense counsel cross-examined Investigator Todd regarding his decision not to send items collected from the Collegiate Inn to the FDLE for DNA analysis, for example, panties worn by the victim (Ex. E at 249–51).  Defense counsel asked Investigator Todd whether he went to the Collegiate Inn, and he responded no (*id.* at 251).  Counsel then inquired:

> Q.    But from your training, things aren't moved at the scene. When somebody gets there, the pictures that are taken would accurately—I mean, the pictures would show the scene the way it was supposed to be, not moved, correct?
>
> A.    Not moved from the time law enforcement gets there?
>
> Q.    Right.
>
> A.    In most cases, yes, sir.

(Ex. E at 252).

The prosecutor asked one question on redirect examination:

Q.    Officer, do you know if anything was moved after the residents of the room moved out and before law enforcement arrived?

A.    I have no clue.

(Ex. E at 252).

The state court reasonably determined that the prosecutor's redirect did not present new matters; therefore, defense counsel had no meritorious basis to argue that the trial court's limitation on recross was erroneous.

For the reasons discussed *supra*, defense counsel did not have a meritorious basis to object to the trial court's limiting his ability to recross Monikia Moore, Jacolbi Banks, and Investigator Todd.  Moreover, although the trial court denied defense counsel's opportunity to recross-examine these witnesses, the court in no way prevented the defense from calling them as defense witnesses and questioning them directly about any new matters to which they testified during redirect.  *See* Hale v. United States, 435 F.2d 737, 752 n.22 (5th Cir. 1970) (prevention of recross-examination "would not have prevented appellant from confronting his accusers; it would only have affected the order of confrontation. All the witnesses were equally available to the appellant and could have been called to the witness stand by him and questioned on direct examination as to any point he desired.").

The state court reasonably concluded that Petitioner failed to show he was prejudiced, in the <u>Strickland</u> sense, by defense counsel's failure to object to the trial court's refusal to permit recross-examination, or by defense counsel's failure to move for a mistrial.  Therefore, Petitioner is not entitled to federal habeas relief on Ground Two.

> C.    <u>Ground Three:  "Trial counsel was ineffective for failing to file notice of expiration of speedy trial and motion to dismiss charges violating Rule 3.191 and due process of law and his constitutional right to speedy trial under the 6th and 14th Amendments to the U.S. Constitution."</u>

Petitioner alleges he was arrested on March 17, 2010 (ECF No. 1 at 7–9).  He alleges that a case management conference was held on July 8, 2010, during which the trial court reset his trial for October 4, 2010.  Petitioner contends defense counsel should have objected to the court's resetting the trial on that date, because the speedy trial time limitation set forth in the Constitution and the Florida Rules of Criminal Procedure was set to expire prior to that date.  Horn alleges he informed defense counsel of the speedy trial violation, and counsel told him "not to worry about it; he would take care of it."  Petitioner alleges he asked defense counsel to file a notice of expiration of speedy trial on September 7, 2010, but counsel never responded to his request.  Petitioner alleges that on September 24, 2010, after the speedy trial period expired, the State requested a continuance of trial due to the unavailability of a trial

witness.  Petitioner alleges the State acknowledged in its motion for continuance that the trial was set outside the 175-day speedy trial period provided in Rule 3.191, and that defense counsel objected to the continuance.  Petitioner alleges the trial court granted the motion for continuance on September 27, 2010, and reset the trial for October 18, 2010.  Petitioner alleges defense counsel then filed an unopposed motion for continuance, to which Petitioner did not consent, to permit the defense time to hire a defense expert to conduct DNA testing of the evidence.  Petitioner alleges defense counsel had plenty of time to hire an expert prior to that.  He states the trial court resent the trial for January 3, 2011, and trial eventually commenced on April 7, 2011. Petitioner claims that defense counsel was ineffective for failing to protect his speedy trial rights.

Respondent concedes that Petitioner exhausted this claim (ECF No. 15 at 30). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 31–33).

1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Issue Five in his Rule 3.850 motion (Ex. M at 26–31). The state circuit court adjudicated the claim as follows:

> Defendant alleges counsel was ineffective for failing to file a notice of expiration of speedy trial and motion to discharge under Florida Rule of Criminal Procedure 3.191, despite his repeated requests that counsel do so. Defendant asserts that when his case was first set for trial at the July 12, 2010, case management conference, the chosen trial date of Oct. 4, 2010, was outside the speedy trial period, which expired on Sept. 8, 2010 (175 days after his arrest on March 17, 2010). Defendant admits that counsel filed a motion for continuance on Oct. 14, 2010, waiving Defendant's right to speedy trial, but asserts he did not consent to this waiver.

> This claim is refuted by the record, which shows that Defendant himself waived his right to a speedy trial in open court on Oct. 14, 2010. On that date, counsel filed an unopposed Motion for Continuance requesting that the trial be continued 60 days so that he could hire a defense expert to re-test the State's DNA evidence and to provide counsel with the ability to confront and cross-examine the State's DNA expert. *Exh. 2 – 10/14/10 Motion*. Defendant was present at the hearing, and when asked by counsel if he agreed to waive speedy trial, Defendant answered in the affirmative. *Exh. 3 – 10/14/10 Hearing Trans*. The defense subsequently moved for another continuance based on the need for further DNA work at a hearing on Dec. 16, 2010, at which Defendant was present and did not object to the continuance. *Exh. 4 – 12/16/10 Hearing Trans*.

> Not only did Defendant expressly waive his speedy trial rights, but these requests for continuance were made with Defendant's knowledge and participation. A defendant's request for continuance made after the expiration of the speedy trial period but before the defendant files a notice of expiration waives the defendant's speedy trial rights on all charges arising from same criminal incident. *State v. Nelson*, 26 So. 3d 570, 580 (Fla. 2010).

> Because Defendant waived his right to a speedy trial, counsel
> cannot be held ineffective for failing to file a notice of expiration.

(Ex. M at 97–98).  The First DCA affirmed the lower court's decision without written

opinion (Ex. P).

This court must abide by the state court's interpretation of state law.  *See*

Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005);

Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).

Therefore, this court is bound by the state court's determination that Petitioner's

speedy trial period expired on Sept. 8, 2010 (175 days after his arrest on March 17,

2010), pursuant to Fla. R. Crim. P. 3.191.  If defense counsel filed a notice of

expiration of speedy trial time the very next day, on September 9, 2010, the trial court

would have been required to hold a hearing on or before September 14, 2010, pursuant

to Fla. R. Crim. P. 3.191(p)(3).  Assuming, to Petitioner's benefit, that the court would

have ordered that Petitioner be brought to trial within 10 days, the trial would have

been scheduled for September 24, 2010, at the latest.  On that day, the State filed a

motion for continuance, which defense counsel opposed, on the ground that one of the

trial witnesses was  unavailable (Ex. A at 46–48).  The motion asserted that the State

issued trial subpoenas on September 20, 2010, and on that day, the State's DNA

expert, who was a critical witness, advised that she would be out of the State during

the week of trial, and that her airplane ticket was non-refundable (*id.*). The State

acknowledged in its motion for continuance that the trial was set outside the 175-day

speedy trial period provided in Rule 3.191, and that defense counsel objected to the

continuance (*id.*). A showing by the State that specific testimony is unavailable

despite diligent efforts to secure it, and that it will become available at a later time, is

an "exceptional circumstance" warranting the court's extension of the 10-day

deadline. *See* Fla. R. Crim. P. 3.191(l)(3). The trial court properly reset the trial for

October 18, 2010. Prior to that date, on October 14, 2010, defense counsel requested

a continuance (*see* Ex. O at 405–06). At the hearing on defense counsel's motion,

Petitioner expressly waived his right to a speedy trial (*id.* at 409). This rendered

Petitioner unavailable for trial and thus not entitled to discharge, pursuant to Fla. R.

Crim. P. 3.191(k).

Petitioner failed to show that he was prejudiced by defense counsel's failure to

assert his speedy trial rights. Therefore, the state court reasonably applied <u>Strickland</u>

in denying Petitioner's claim. Accordingly, Petitioner is not entitled to federal habeas

relief on Ground Three.

D.   <u>Ground Four: "Trial counsel was ineffective for failing to investigate</u>
<u>and specifically argue at a pretrial motion [sic] for the State that Florida</u>
<u>evidence laws do not abrogate a Petitioner's constitutional rights to proffer and</u>
<u>admit false accusation evidence violating [sic] Petitioner's right to cross</u>

<u>examination, confrontation and due process of law under 5th, 6th, and 14th Amendments.</u>"

Petitioner claims that the State filed a motion in limine to prevent admission of evidence of the victim's prior sexual conduct with individuals other than Petitioner (ECF No. 1 at 10–11). Petitioner alleges the State had provided a report to defense counsel of a forensic interview of the victim conducted by Kendra Walker, a Case Specialist with the Child Protection Team. Petitioner alleges the report indicated that the victim had accused a family member, "Alphonso," of sexual abuse in 2009, but "Alphonso" was not prosecuted because the victim fabricated the allegations.[3] Petitioner contends defense counsel was deficient for failing to introduce the CPT report and call "Alphonso" as a witness at the pre-trial hearing, and for failing to argue that exclusion of evidence relating to the prior sexual abuse allegation violated Petitioner's constitutional rights to confront his accusers and due process.

Respondent concedes that Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (ECF No. 15 at 34). Respondent contends the state court's adjudication of the claim is entitled to deference (*id.* at 34–36).

---

[3] Petitioner submitted a portion of Ms. Walker's report (pages 2 and 4 of the 4-page report) to the state court as an attachment to his Rule 3.850 motion (Ex. M at 50–51). The submitted portions did not mention a previous allegation of sexual abuse of the victim, nor did the submitted portions mention "Alphonso."

  1.  Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

  2.  Federal Review of State Court Decision

Petitioner raised this claim as Issue Six in his Rule 3.850 motion (Ex. M at

31–35).  The state circuit court adjudicated the claim as follows:

> Defendant alleges counsel was ineffective for failing to investigate a 2009 CPT report involving the victim and a cousin named Alphonso accused of sexually abusing her, in which Defendant claims the victim fabricated the story.  Defendant asserts that counsel should have called Alphonso as a witness to impeach the victim and to support the defense theory of false accusation, and argues that counsel should have raised the issue of this witness during the hearing on the State's pretrial motion in limine to keep out evidence of the victim's prior sexual conduct.

> This claim is without merit.  Any such testimony regarding alleged prior false accusations of sexual abuse by the victim would be inadmissible as improper impeachment of the victim in a sexual battery case, as set forth in *Pantoja v. State*, 59 So. 3d 1092, 1094–98 (Fla. 2011), cited by the Court as the basis for granting the State's motion in limine.  Further, as noted by the State during the hearing, section 794.022 prohibits admission into evidence in a sexual battery prosecution of instances of prior sexual activity between the victim and any person other than the offender, except in limited situations which do not apply here.  § 794.022(2), Fla. Stat.

> Defendant has failed to show deficient performance on the part of counsel.

(Ex. M at 98–99).  The First DCA affirmed the lower court's decision without written

opinion (Ex. P).

The transcript of the hearing on the State's pre-trial motion in limine demonstrates that defense counsel argued that he had a limited right to cross-examine the victim regarding her knowledge and observations of sexual activity, and her previous sexual experiences, because those areas of inquiry were relevant to her credibility, in terms of whether she fabricated the allegations against Petitioner (*see* Ex. D at 6–11). The trial court rejected defense counsel's arguments and determined that evidence of the victim's prior sexual activity was not admissible, either as substantive evidence or for impeachment, under Florida law, specifically, Pantoja v. State, 59 So. 3d 1092, 1094–98 (Fla. 2011) and Fla. Stat. § 794.022(2) (Florida's "rape shield law") (*id.* at 5–15).[4]

---

[4] In Pantoja, the Florida Supreme Court held that under Florida law, a victim may not be cross-examined about an alleged prior false accusation that did not result in a criminal conviction, and that the trial court's exclusion of evidence of minor victim's prior false accusation of molestation against a person other than the defendant does not violate the defendant's constitutional right to confront his accusers. 59 So. 3d at 1097–98.

Florida's "rape shield law" provides, in relevant part:

Specific instances of prior consensual sexual activity between the victim and any person other than the offender may not be admitted into evidence in a prosecution under s. 787.06, s. 794.011, or s. 800.04. However, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence may prove that the defendant was not the source of the semen, pregnancy, injury, or disease; or, when consent by the victim is at issue, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.

In the order denying Petitioner's Rule 3.850 motion, the state court concluded that evidence of the victim's prior sexual activity, whether offered as impeachment or as substantive evidence, was inadmissible under Florida law.  This federal court must defer to that conclusion.  *See* <u>Callahan v. Campbell</u>, 427 F.3d 897, 932 (11th Cir. 2005) ("It is a fundamental principle that state courts are the final arbiters of state law, federal habeas courts should not second-guess them"—the Alabama Court of Criminal Appeals had already answered the question of what would have happened had counsel objected to the introduction of petitioner's statements based on state decisions; the objection would have been overruled; therefore, counsel was not ineffective for failing to make that objection) (citation and internal quotation marks omitted).

Additionally, Petitioner failed to show that defense counsel had a factual basis for arguing that the victim had made prior accusations of sexual abuse that were false. The portions of the CPT report submitted by Petitioner in the Rule 3.850 proceeding did not mention a prior false allegation by the victim.  Further, the transcript of the hearing on the State's motion in limine does not suggest that there was any evidence that the victim made a prior false allegation of sexual abuse (*see* Ex. D at 5–15). Therefore, Petitioner failed to show that counsel performed deficiently at the pre-trial

---

Fla. Stat. § 794.022(2).

hearing by omitting argument and evidence on this point.  Further, Petitioner failed to show a reasonable probability that the trial court's ruling on the motion in limine would have been different if defense counsel had made the arguments and submitted the evidence that Petitioner faults counsel for omitting.  *See* United States v. Frederick, 683 F.3d 913, 915 (8th Cir. 2012) (trial court's limitation on sexual abuse defendant's cross-examination of his victims regarding their prior allegedly false accusations of sexual abuse against bus driver and school teacher did not violate his Confrontation Clause rights; evidence was too attenuated to provide more than minimal probative value, as evidence was inconclusive as to falsity of prior accusations).

The state court reasonably concluded that Petitioner failed to demonstrate ineffective assistance with regard to defense counsel's handling of the issue raised in the State's motion in limine.  Therefore, Petitioner is not entitled to federal habeas relief on Ground Four.

   E.   Ground Five: "Trial counsel was ineffective for failing to cross examine DNA expert violating Petitioner's right to confrontation and due process of law under State and Federal Constitution [sic]."

Petitioner claims that defense counsel was ineffective for failing to cross-examine the State's DNA expert, or call the expert as a defense witness, regarding the

possibility that Petitioner's semen could have been planted (ECF No. 1 at 30–33). Petitioner alleges the theory of defense was that Monikia Moore preserved Petitioner's semen after their consensual sexual activity 2–3 weeks prior to the alleged sexual battery, and then planted it on her little sister's (the victim's) body or in her panties because she was upset with Petitioner.

Respondent concedes Petitioner exhausted this claim (ECF No. 15 at 37). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 37–40).

 1.   Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

 2.   Federal Review of State Court Decision

Petitioner raised this claim as Issue Eight in his Rule 3.850 motion (Ex. M at 41–45). The state circuit court adjudicated the claim as follows:

> Defendant alleges counsel was ineffective for failing to cross-examine the State's DNA expert about whether it was scientifically possible that the semen found on the victim was planted there. Defendant states this would have supported the defense theory that Monikia Moore, Defendant's then-girlfriend, had performed oral sex on Defendant two to three weeks earlier and saved the semen from that encounter, then on the night of the incident placed that semen on the genital area or underpants of the victim, her 11 year-old sister, in order to frame Defendant because she was mad at him. Claudette Cleary, FDLE crime laboratory analyst, testified that she analyzed the buccal

swabs taken from Defendant and the victim and unidentified swabs from the sexual assault kit, which previous testimony had indicated were the swabs taken from the victim's peritoneal area, and determined a match between Defendant and the semen found on the victim. *Exh. 1 at 77–83; 253–77.*

Defendant is correct that counsel did not cross-examine the witness. *Id.* at 277. Nevertheless, even if he had done so and specifically asked her about the possibility of the DNA being planted, there is no reasonable probability that such cross-examination would have caused the outcome of the trial to be different because the rest of the evidence against him was highly incriminating. The victim and eyewitness Monikia Moore, the victim's sister, testified at trial as to the sexual battery that occurred that night. *Id. at 109–21, 131–64, 208–26.* The victim testified that she was telling the truth about what happened and that her sister did not tell her to make it up out of anger at Defendant, stating, "I'm not lying." *Id. at 219, 225.* Ms. Moore specifically stated that around the time of the incident, she did not perform oral sex on Defendant and never saved semen from oral sex, from which the conclusion can be drawn that she did not plant previously-collected semen on the victim. *Id. at 140–41.* CPT investigator Kendra Walker testified about her interview with the victim regarding the sexual abuse and a video recording of the interview was played for the jury, in which the victim described the events of the sexual battery in detail, consistent with her live testimony. *Id. at 282–314.* Most importantly, there was the DNA evidence itself— Defendant's semen was collected from the victim's genital area. *Id. at 77–83; 253–77.* The only testimony that Defendant was innocent and that Ms. Moore had earlier saved his semen came from Defendant, who had an interest in the outcome of the case. *Id. at 385–87.*

Although counsel did not cross-examine Ms. Cleary as Defendant suggests, counsel first introduced the defense theory that Defendant was framed during his opening statement, pursued the issue during Defendant's testimony and while cross-examining the victim and Ms. Moore, and during his closing statement strenuously argued the

possibility that Defendant was framed while pointing out inconsistencies in the testimonial evidence. *Id. at 72–76, 140–41, 219, 225, 467–77, 481–87.* During opening, counsel explained to the jury that in light of Defendant's testimony that he did not commit the crime, the only conclusion was that the semen was planted on the victim. *Id. at 75.* As counsel admitted during closing, he did not have the burden to prove the semen was planted, he merely had to raise the possibility that it was planted in order to incur reasonable doubt as to Defendant's guilt. *Id. at 473–74.* Further, the suggested crossexamination of Ms. Cleary would not be as strong as Defendant seems to believe; contrary to his position, even if Ms. Cleary stated it was scientifically possible the semen was planted, such testimony would not have gone so far as to corroborate his defense and certainly would not have been exculpatory.

Because Defendant has failed to show the required prejudice, counsel cannot be held ineffective.

(Ex. S at 83–84). The First DCA affirmed the lower court's decision without written opinion (Ex. P).

The state court reasonably concluded that Petitioner failed to show that he was prejudiced by defense counsel's failure to question the DNA expert about the possibility that Petitioner's semen could have been planted on the victim's body or in her panties. Petitioner proffered no reliable evidence of how the DNA expert would have answered such questions, let alone that her answers would have been favorable to the defense. Further, as the state court found, defense counsel pursued the "planted DNA evidence" theory in his opening statement, cross-examination of the State's witnesses, and direct examination of Petitioner, and counsel argued during closing

arguments that Petitioner had no burden to present any evidence supporting his innocence, and that there was reasonable doubt as to Petitioner's guilt. Petitioner failed to demonstrate that the state court unreasonably applied <u>Strickland</u> in denying this claim. Therefore, he is not entitled to federal habeas relief on Ground Five.

F.    <u>Ground Seven:</u>[5]  <u>"Trial counsel was ineffective for failing to have the evidence used against Horn tested for DNA in accordance with his theory of defense under the 6th and 14th Amendments to the U.S. Constitution."</u>

Petitioner claims that defense counsel was ineffective for failing to pursue DNA testing of the evidence (including the peritoneal swabs from the victim, the victim's panties collected by the Child Protection Team examiner, and sweatpants, a pair of panties, and carpet samples collected from the Collegiate Motel) to determine whether Monikia Moore's DNA was present (ECF No. 1 at 17–19). Petitioner contends that if such testing was performed, it would show that Monikia Moore was another DNA contributor to evidence containing Petitioner's DNA, because Petitioner's semen was in her mouth (as a result of their prior sexual activity) prior to its being "planted" on the victim's body. Petitioner contends he would have been acquitted of the sexual battery if defense counsel had pursued DNA testing. Petitioner states he did not present this claim to the state courts (*id.* at 19). He argues that his procedural default

---

[5] The court re-ordered Petitioner's claims for organizational purposes.

of this claim was caused by his lack of legal representation during the Rule 3.850 proceeding (*id.* (citing Martinez v. Ryan, 132 S. Ct. 1309 (2012))).

Specifically addressing Ground Seven, Respondent states that Petitioner exhausted his state court remedies by presenting his arguments in his Rule 3.850 motion (ECF No. 15 at 42–43). Respondent contends the state court adjudicated the claim on the merits, and the court's adjudication is entitled to deference (*id.* at 43–45). In the "General Principles" section of Respondent's answer, Respondent states, "Although Respondent addresses select procedural bars and addresses the claims on the merits, **Respondent asserts all available procedural bars**." (*id.* at 15).

In Petitioner's Rule 3.850 motion and in his federal habeas petition, Petitioner argues that defense counsel was ineffective for failing to pursue DNA analysis of the evidence; however, the factual basis he asserted in support of his Rule 3.850 motion is different than the factual basis he asserts in his federal petition. In state court, Petitioner argued that defense counsel should have pursued DNA testing of the items collected from the motel room and the panties collected from the CPT examiner, to determine whether Petitioner's DNA was on any of the items. Petitioner asserted that the results of DNA testing would have shown that Petitioner's DNA was not on those items, thus supporting his defense that Monikia Moore and the victim planted his

semen (*see* Ex. M at 3–10).  Petitioner presents a different factual basis in his federal

petition.  In Petitioner's federal petition, he argues that defense counsel should have

pursued independent DNA testing of <u>all</u> of the evidence, including the evidence that

was tested by the State's expert (i.e., the peritoneal swabs from the victim) and the

evidence that was not tested by the State's expert (i.e., the items collected from the

motel room and the panties collected by the CPT examiner), to determine whether

<u>Monikia Moore's</u> DNA was present on any of it.  Petitioner asserts that the results of

DNA testing would have shown that Monikia Moore's DNA was on all of the items

that also contained Petitioner's DNA.  He argues that this evidence would have

supported his defense that Monikia Moore and the victim planted his semen.

To the extent Petitioner claims that defense counsel was ineffective for failing

to pursue DNA testing of the evidence that was <u>not</u> tested by the State, Petitioner

fairly presented his claim to the state courts as Ground One of his Rule 3.850 motion

(Ex. M at 3–10).  The state circuit court adjudicated the claim as follows:

> Defendant alleges counsel was ineffective for failing to have DNA
> testing performed on one pair of underpants collected from the victim
> and placed in the sexual assault kit and one pair of underpants and two
> carpet samples collected from the Collegiate Inn hotel room where the
> incident took place.  Defendant claims that such testing would have
> established that his DNA was not present on these items, thereby
> exonerating him by proving that the victim was lying and by negating
> any other evidence linking Defendant to the sexual battery.  Defendant

also alleges that the purported negative test results would have bolstered the defense theory that the victim's sister (Defendant's then-girlfriend) planted Defendant's semen on the victim in order to frame him.

As established at trial, DNA evidence was collected from the victim's peritoneal area during the sexual assault medical examination and a buccal swab was obtained from Defendant. *Exh. I – Trial Transcript, pp. 80–83, 242–43*. The State's DNA expert determined that the DNA evidence collected from the victim consisted of sperm cells and matched Defendant's DNA. *Id. at 266–77*. The State presented testimonial evidence of the victim (11 years old at the time of the incident) and an eyewitness (the victim's sister) in support of its case. The victim testified that on the morning of the incident, although she had been sleeping on a bed in the hotel room where she was staying with her sister and Defendant, she awoke on the floor with Defendant on top of her while he was pulling up her pants. *Id. at 212–13*. His pants were down and his penis was touching her vagina. *Id. at 213–18*. The jury also watched the videotaped Child Protection Team interview with the victim, in which she described the incident. *Id. at 292–310*. Monikia Moore, Defendant's then-girlfriend, testified that she woke to find her sister on the ground with her pants down and shirt pulled up, with Defendant lying on top of her with his pants down, with his face in between her breasts. *Id. at 108–20, 131–36*.

Contrary to Defendant's assertions, counsel was not required to ensure the DNA testing of every single piece of evidence gathered in the case and was not deficient in failing to have these additional items tested. Further, the absence of Defendant's DNA on the listed items would not have exonerated him or had any bearing whatsoever on his guilt or innocence, and it certainly would not have supported his theory that the semen was planted on the victim. In light of the significant exculpatory [sic] evidence adduced at trial, Defendant cannot show the required prejudice because there is no reasonable probability that DNA testing of these items would have resulted in a different outcome.

(Ex. M at 93–95).  The First DCA affirmed the lower court's decision without written opinion (Ex. P).

The state court reasonably concluded that Petitioner failed to show a reasonable probability of a different result at trial if defense counsel had secured DNA analysis of the items that the State's expert did not analyze (i.e., the items collected from the motel room and the panties collected from the victim by the CPT examiner). Petitioner's assertion, that if defense counsel had obtained DNA testing, it would show that his DNA was not on any of the items, is based purely upon speculation. Further, even if DNA testing would have shown that Petitioner's DNA was not on any of those items, the test results would not have exculpated Petitioner, since his sperm was found in the victim's peritoneal area (near her vagina).  At most, defense counsel could have argued that the absence of Petitioner's DNA supported the "planted evidence" theory and created reasonable doubt about his guilt; however, in light the overwhelmingly inculpatory nature of the DNA evidence presented at trial, there is no reasonable probability that Petitioner would have been acquitted even if DNA testing had produced results consistent with Petitioner's speculative assertions. Therefore, Petitioner failed to demonstrate that the state court unreasonably applied Strickland in adjudicating the claim presented to that court.

To the extent Petitioner claims that defense counsel was ineffective for failing to pursue DNA testing of the evidence that was analyzed by the State's DNA expert, namely, the peritoneal swabs collected from the victim, Petitioner did not present this claim to the state courts, and he admits that he did not. Notwithstanding the exhaustion issue, Petitioner's claim is without merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

The State's DNA expert, Claudette Cleary, testified that she performed DNA testing on swabs from the victim's peritoneal area (near her vaginal opening) (Ex. E at 253–277). Ms. Cleary testified that she identified semen on both swabs, which contained both sperm cells and epithelial (skin) cells. She testified that she developed two DNA profiles from the swabs, one in the epithelial cell fraction and the other in the sperm cell fraction of the semen. Ms. Cleary testified that she compared the DNA in the epithelial cell fraction with the DNA in a buccal swab collected from the victim's mouth, and determined the DNA in the epithelial cell fraction matched the victim's DNA. Ms. Cleary testified that she compared the DNA in the sperm cell fraction with the DNA in a buccal swab collected from Petitioner's mouth, and

determined the DNA in the sperm cell fraction matched Petitioner's DNA.  Ms. Cleary testified that based upon the results of her testing, the frequency of occurrence of the foreign DNA profile (i.e., the DNA profile that was not the victim's) in the sperm cell fraction of the DNA from the peritoneal swab was 1 in 13 quadrillion African Americans.

Petitioner's assertion, that if defense counsel had obtained additional DNA testing, it would show that Monikia Moore was another DNA contributor to any evidence containing Petitioner's DNA, is based purely upon speculation.  He has not proffered any evidence to support this assertion.  Further, Ms. Cleary's testimony refutes any suggestion that a third DNA contributor would have been discovered with additional testing.  Ms. Cleary testified that she developed <u>two</u> DNA profiles from the peritoneal swabs, not three (Ex. E at 269).  Moreover, the state court record indicates that defense counsel hired a DNA expert to examine and re-test the State's DNA evidence (*see* Ex. O at 405–14), and defense counsel obtained a court order directing that the evidence tested by the State be sent to Sorenson Forensics, an independent laboratory in the State of Utah, for testing (*see* Ex. A 56).  Petitioner has not proffered any evidence suggesting that the independent testing revealed evidence that supported Petitioner's "planted evidence" theory.

Petitioner failed to demonstrate a reasonable probability that the result of his trial would have been different if defense counsel had pursued additional DNA testing of the evidence to determine whether Monikia Moore's DNA was present; therefore, Petitioner failed to satisfy the prejudice component of the <u>Strickland</u> standard. Accordingly, he is not entitled to federal habeas relief on Ground Seven.

>  G.   <u>Ground Six: "When considering the cumulative effect of trial counsel's representation and/or the errors presented in this motion, the level of presentation [sic] fell below that of a reasonable, competent attorney. It is reasonably probable but for these acts, errors, deficiencies and omissions by counsel, the result in the Horn's [sic] trial would have had a different outcome and thus not prejudiced Horn to a fair trial."</u>

Petitioner does not elaborate any further on this claim (ECF No. 1 at 16). Respondent contends this issue is not cognizable in federal habeas (ECF No. 15 at 41). Respondent additionally contends that none of Petitioner's claims, considered individually, show that constitutional error occurred at trial; therefore, Petitioner cannot establish a constitutional violation based upon a cumulative effect theory (*id.* at 41–42).

Petitioner raised this claim as Issue Nine in his Rule 3.850 motion (Ex. M at 46). The state circuit court adjudicated the claim as follows:

>  Defendant alleges cumulative ineffective assistance of counsel based on the grounds raised in Issues One through Nine. For the reasons set forth in this order, Defendant did not receive ineffective assistance of

counsel in Issues One through Eight individually, as well as Issues Nine
and Ten. When all individual claims of ineffectiveness are denied, the
claim of cumulative ineffectiveness shall also be denied. *Jones v. State*,
949 So. 2d 1021 (Fla. 2006).

(Ex. M at 102). The First DCA affirmed the lower court's decision without written

opinion (Ex. P).

In rejecting a similar "cumulative error" argument made by a § 2254 habeas

petitioner, the Eleventh Circuit stated: "The Supreme Court has not directly addressed

the applicability of the cumulative error doctrine in the context of an ineffective

assistance of counsel claim." Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 564

(11th Cir. 2009) (per curiam) (unpublished but recognized for persuasive authority).

The Forrest panel further noted "[h]owever, the Supreme Court has held, in the

context of an ineffective assistance claim, that 'there is generally no basis for finding

a Sixth Amendment violation unless the accused can show how specific errors of

counsel undermined the reliability of the finding of guilt.'" *Id.* at 564–65 (quoting

United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657

(1984)).

In light of Cronic and the absence of Supreme Court precedent applying the

cumulative error doctrine to claims of ineffective assistance of counsel, the state

court's rejection of Petitioner's claim is not contrary to or an unreasonable application

of clearly established federal law.  *See* <u>Wright v. Van Patten</u>, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 478, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) (The Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this."); <u>Reese v. Sec'y, Fla. Dep't of Corr.</u>, 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also* <u>Morris v. Sec'y, Dep't of Corr.</u>, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).  Therefore, Petitioner is not entitled to federal habeas relief on Ground Six.

IV.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.        That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 31<u>st</u> day of August 2016.


<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**